WRIGHT J.
delivered the opinion of the court. The complainant claims to be a judgment creditor o£ the estate of St. Clair, and to have issued execution, which has been returned nidia bona ; and he prays this court to charge his demand upon certain real estate which was of the intestate, now in the hands of the defendants. Voluminous matters are set forth in the bill, answers, exhibits and evidence, many of which, in the estimation of the court, have no material bearing upon the real controversy before it. I will not, therefore, state the allegations of the bill and answers in detail, but content myself with giving a statement of the material facts of the case, as the court understand them to be made out upon the papers, the documentary evidence and testimony on file.
The complainant and his brother, now deceased, in September, 1820, a few days before St. Clair’s death, entered into an agreement with him, by which they undertook to satisfy certain liabilities of St. Clair, to the Farmers’ and Mechanics’ Bank of Cincinnati, then about to be transferred to the Bank of the United States, and for the amount so satisfied, the Piatts were to have credit upon a mortgage St. Clair held against them for about $11,000, and were to be paid for the residue in land on Main street, in Cincinnati, at $75 a foot. In pursuance of this agreement, the Piatts satisfied for St. *268 Clair the sum of $23,875.49, and took a transfer to themselves of the liabilities of St. Clair. This arrangement with the bank, was not fully completed, until about the 14th of October, 1820, a few days after St. Clair’s death.
263] *St. Clair died suddenly, in September, 1820, without will. Administration on the estate was granted to William Lytle, in March, 1821. The administrator did not pay the claim of the Piatts, but admitted a part of it as a general claim upon the estate, and confessed judgment for the amount, in favor of the Farmers’ and Mechanics’ Bank, for the use of Piatts, on the 10th of May, 1821, viz.: $17,741.12-|-, supposing thereby that he secured to himself the privilege of paying it in the notes of that bank.
When St. Clair died, the taxes upon his real estate were unpaid for the years 1819 and 1820. The adminstrator paid these taxes, and those for 1821; but having no faith in the validity of tax sales, and finding it inconvenient to raise money to pay the taxes for 1822, he suffered them to remain unpaid, expecting that no sale would take place, and that the tax would lie until another year. Contrary to his expectation, the lands were brought to sale for taxes, and bidders attended. Arthur St. Clair, Jr., one of the children and heirs, then a few months over nineteen years old, attended the sale without any intention of bidding, but being advised to bid, and assured of pecuniary aid, he did, on the 24th of. December, 1822, buy in the estate at the tax sale. Bjr his consent, the collector’s deed was made to Jones, his guardian, on the 24th of May, 1823. The administrator did not consider this sale as extinguishing the lien of creditors.
On the 26th of February, 1822, the administrator, representing the personal assets as insufficient to pay the demands against the estate, applied to the probate court, according to law, for an order to sell the real estate of the intestate. Upon his application an appraisement was made, in March, 1822. This was returned to the court and confirmed on the 17th of March, 1S23. On that day, a sale was ordered to be made, and to be returned on the 19th of August, 1823.
On the lltli of June, 1823, Jones, guardian of A. St. Clair, at' the request of his ward, conveyed the estate to Joseph S. Benham, in trust for the heirs of St. Clair. Two days after this, the ward filed a bill in the name of Benham, to quiet the title to these lands; the pendency of which he caused to be advertised in the newspapers. This bill was afterwards dismissed.
On the 20th of June, 1823, the administrator took out the order *269 of court for the sale of the estate, advertised the sale on the 23d of the same month, in the same paper with the notice of the qui timet bill in the name of Benham. The sale took place on the 6th of August, 1823. In the written conditions of this sale, the administrator set forth a number of liens upon the estate, subject to [264 which the purchaser at the sale would take. Amongst these were Benham’s claim, the tax sale and conveyance to Jones, and thePiatt claim, “under an alleged contract” with St. Clair, before his decease. The terms of sale required payment in four equal installments, in nine, fifteen, twenty and twenty-four months, with interest from the sale, upon satisfactory security. At this sale, the estate was struck off to Arthur St. Clair, Jr., who then wanted afew days of being twenty years of age. He paid no money, nor gave any security. The administrator returned the sale to the court, without naming the purchaser, and it was confirmed by the court on the 19th of August, 1823, without its being shown to whom the sale was made.
On the 12th of November, 1823, Lytle, in his capacity of administrator, in conjunction with young St. Clair, conveyed the estate to Joseph S. Benham, as trustee, declared in the deed to be “without interest in or responsibility for the lands,” to hold to him or his successors, assigns, or grantees, in trust, to pay the purchase money, and for “liquidating such claims against the estate of A. St. Clair as the parties to the deed might see fit and' expedient.” Amongst other things, this deed recites that young St. Clair was “ desirous of securing to himself and co-heirs the ultimate resulting proceeds,” of the land, “ after paying the purchase money, and satisfying such claims as all the parties to the deed may agree upon.” The deed provides for the distribution of the residue of the proceeds equally amongst the children of St. Clair, or the division of land amongst them, as might be convenient. Benham' took both these trusts out of sympathy and regard for the St. Clair family.
Some time prior to this sale, a negotiation had been opened by the administrator, with the Bank of the United States, one of the creditors of St. Clair’s estate, having in view the liquidation of her claim, by the convej’'ance of a portion of the lands of the estate held by Benham under Jones’s conveyance. On the 13th of November, 1823, one day subsequent to the deed of the administrator to Ben-ham, the Bank of the United States adopted a resolution, in these words: “ Resolved, that if the legal representatives of Arthur St. Clair, deceased, convey to the president, directors and company of the Bank of the United States, by a clear, undisputed and uneneum *270 bered title, to the satisfaction of George W. Jones, the lots designated in the draft exhibited by Henry Avery, and described in the ‘article for adjusting,’ <&c., forwarded by George W. Jones, together with the lots marked in the same draft, Nos. 35 and 32, then the agent is authorized to make an advance to the family of Arthur 265J *St. Clair, of $500; to advance for the payment of taxes belonging to that estate, a sum not exceeding $300; to give to the said representatives a check on the Miami Exporting Company, for the sum of $2,000, and to execute a release of all claims by the bank on said estate.” Under the authority of this resolution, after its receipt in Cincinnati, Jones, as agent of the bank, completed the arrangement with the administrator, took from Benham a conveyance of the lots on the 8th of December, 1823, and executed a release to the administrator and heirs of the same date. At that time, the bank had the control of a mortgage upon St. Clair to the Miami Exporting Company, of the 29th of June, 1820, on out lot 23, for $14,584; another dated the 6th of March, 1820, given to the Cincinnati college, upon out lot 34, for $4,000, a judgment entered in the Hamilton Common Pleas, the 25th of February, 1820, for $12,413.55, and other claims against the estate, amounting to $9,234.09. These several claims, with interest, at that time amounted to about $36,328.38, exclusive of advances made for taxes, and to the widow and heirs. The bank, at that time, held the paper of Lytle, the administrator, on which St. Clair was security, to the amount, principal and interest, of $79,858.85, and held the estate liable on a small note of one Sinks, amounting, principal and interest, to $297.87.
Piatt filed a bill in chancery, against the representatives of St. Clair, praying for a specific performance of the contract ma.de with St. Clair, in September, 1820, for the lot on Main Street, which was dismissed.
In August, 1824, the administrator not having credited anything to Piatt upon the mortgage, or paid him anything on account of the judgment, brought a sci. fa. upon the mortgage against him. To this he set up as a defence, payment under the contract of September, 1820, and on trial, in May, 1824, he gave in evidence to the jury the contract aforesaid, and the whole amount of claims paid under it (including the note embraced in the payment in his favor) against the administrator, and obtained a verdict of the jury, that the defendant was entitled to have so much of the matter set forth in his plea, arising under an agreement made with Arthur St. Clair, in his lifetime, as is equal to the amount due upon the mortgage, *271 in the writ of scire facias mentioned, set off against the plaintiff’s claim upon the mortgage, which amounted to $10,872.24, on the 14th of October, 1820, leaving a balance due to the defendant, May 20th, 1828, of $20,113.41f, besides costs.”
*Martin, one of the jurors, testifies that the jury allowed [266 Piatt’s entire claim, which consisted of various notes, one or two accounts, and a judgment, and gave him a verdict for $20,000.
There is some uncertainty attending the transaction between Piatt and the administrator. The arrangement with the bank, by which the Piatts took up St. Clair’s paper, was completed as early as the 14th of October, 1820. The amount, at that time, is conceded to have been $23,875.49. The mortgage money then amounted to $10,872.24, which would leave due from the estate to Piatt, at that date, $23,003.25. The judgment against the administrator, of the 10th of May, 1821, was for the sum of $17,740.77-2, besides costs.
It does not appear, that any part of the sum due from St. Clair’s estate to Piatt was ever paid by the administrator, or the heirs, though it is testified by Kirby, that in behalf of Gen. Lytle, he once called on Piatt, and offered to convey to him in satisfaction of his claim, a lot on Vine street, a part of the premises held by Benham; This offer was refused, because the lot was remote, and of but little value.
The out lots in Cincinnati, which were conveyed to Benham, were subdivided into four or more squares of small building lots, and sold from time to time, under the direction of the trustee, the heirs, and their guardians. And many claims against the estate of St. Clair were liquidated by the conveyance of portions of this estate, as subdivided; and Benham, the trustee, conveyed some thirty or forty different lots in the subdivision, to satisfy claims upon the estate, between the date of the deed to him and the year 1823. Many of these lots have been resold and passed through various 'hands. Much of the estate has been enhanced in value by improvements.
Lytle, the administrator, died in 1831, without having settled up his administration account. The greater proportion of the disbursements he made were of the proceeds of sales of portions of the trust property.
From the month of June, 1827, down to March, 1832, the heirs of St. Clair made numerous conveyances of portions of the trust property included in Benham’s deed, and by him subdivided. The consideration for these conveyances, as expressed in the deeds, amounts to upwards of $41,000.
*272 ■ In 1831 partition was made amongst the heirs of St. Clair, of the then remaining portions of said real estate, and each one’s portion 267] *thereof was alloted in severalty. Some of this estate still remains in said heirs.
The conveyance to Benham in trust, and by him to his various grantees, has been recognized and confirmed by repeated acts of the administrator, of the adult heirs, and the guardians of the minor heirs, and the estate divided by the partition is still held under the conveyance of Benham.
■ There can be little doubt but the arrangement with Benham was made with the assent of Lytle, the administrator, and the other persons concerned, with the intention to place the real estate of the intestate in a situation to be managed for the benefit of the heirs, and to use it advantageously for them to discharge the demands against the estate. In this, no fraud was intended by the administrator and the others concerned. The measures were prosecuted with good feeling for the children, without intention of injury to creditors, and without any distinct impression that injury would result to them. Such things are frequently done; and it is quite probable, that the proceeding in this case saved this estate from actual insolvency.
Besides the claim of the complainant, there are still some other claims upon the estate, outstanding and unpaid.
The first question which arises in the case, is, whether the complainant shows himself a judgment creditor, entitled to come into this court for relief ?
Lytle, the administrator, confessed a judgment in favor of the complainant, as early as 1821, one month after he was appointed. By the chancery act, judgment creditors, where the debtor has not sufficient effects subject to levy to satisfy the execution, may proceed in chancery to subject the effects of the debtor, in the hands of any person, to the payment of the judgment; 29 O. L. 84. The chancery act of 1824 gave to judgment creditors the same power, but restrained them from proceeding in this court, in some cases, until after execution had been issued, and returned at law; 22 O. L. 85, 86, 87, 88. The jurisdiction of the court may be sustained upon either of these laws, on the case made, if the judgment remains in force, or upon general principles, because the case is so connected with trusts and equities, and involves such a variety of interests, that plain and adequate remedy cannot be had at law.
But it is urged that the judgment of Piatt, having been set off in satisfaction of the suit upon the mortgage, no longer exists, but is *273 merged in that proceeding. It appears, that upon the scire facias against Piatt, on the mortgage, the defendant relied upon the plea *of payment. To sustain this plea, he proved to the satisfaction [268 of the jury, the original contract with St. Clair, to take up his notes in the Farmers’ and Mechanics’ Bank, and he exhibited the notes so taken up, an account, and also the judgment, in evidence. The jury found, that the sum of $10,872.24, was due on that mortgage, the 14th of October, 1820, when the agreement was consummated, and that so much of the sum due to Piatt from the estate,, as was equal to that sum, was a payment of it. This was a substantial finding of the plea of payment for the defendant, upon which there was judgment for him. Does this operate to extinguish the judgment which the complainant obtained years before against the administrator ? The act under which the scire facias was prosecuted (22 O. L. 232), only authorized the defendant to avoid the award of execution, by showing payment, or satisfaction, or some other legal bar. The statute of off-sets did not allow the pleading a set-off in bar, but only to make off-sets available in certain actions upon notice; 22 O. L. 101. This law was not considered applicable to the proceeding by scire facias on a mortgage, and of consequence was inapplicable to the case against the present complainant. Such was the judgment of the court. One of the jurors has been examined as a witness, as to what was offered in evidence before the jury, to prove the payment. His evidence is objected to by the respondents, as incompetent to prove what is of record. If the objection is good, there is no evidence to show that the judgment of the complainant was used on that trial at all; and of course it stands available to him in this case, for the whole amount. But we see no valid objection to his testimony, as to what constituted the payment or satisfaction of the mortgage, upon which the jury found their verdict. He proves that Piatt, on that issue, gave in evidence various notes, one or two accounts, and a judgment; that the jury allowed all the claims, and found a verdict for Piatt of $20,000. The utmost the respondents can ask from this testimony is, that the judgment given in evidence, shall be holden by the court to be the same that is described in the bill. We so take it. A recurrence to the date, to the amount of the judgment, the sum admitted to have been paid for St. Clair by the Piatts, and the sum due on the mortgage, in October, 1820, will furnish grounds from which the amount due when the verdict, was found may be ascertained to be near what the juror swears it was, say $1.9,179.86. The judgment against St. Clair’s administrator, with the interest calculated up to *274 the time of the trial, would amount to the sum of $25,191.85. It was necessary to prove that judgment to the jury, in order to explain 269] *the whole transaction; but what was in fact absorbed by the verdict, will depend upon the sum due in October, 1820. If the sum due in October, 1820, exceeded the $10,872.24, which was then due on the mortgage, the balance would remain a debt against the estate; if it amounted to less, the judgment upon the mortgage should have been rendered for the balance only. The conceded amount settled by the Piatts at the Farmers’ and Mechanics’Bank, was $28,875.49. The $10,872,24 due on the mortgage, deducted from this, leaves $13,003.25. This sum, with interest from October, 1820, to May, 1821, the date of the judgment against Lytle, amounts to $13,462,55, yet the judgment was confessed for $17,740.77$-, more by $4,788.22; what this excess was for, we cannot certainly ascertain, nor is it easy to make out clearly what is now due to the complainant. The administrator, in his statement to the court in 1826, puts the Piatt claim down at $32,000. In the agreement signed by Piatt and the heirs, it is estimated at $20,113.41 on the 20th of May, 1828.
The following statement shows the state of case as it appears to-us:
The amount of Piatt’s claim, on the 14th of
October, 1820, was, ..... $23,875 49
The mortgage of the same date, . . . 10,872 24
Left due Piatt,
Interest on this balance to 2d May, 1833,
$13,003 25 9,789 50
Balance due Piatt then,
To which add costs and interest on the two judgments,......
$22,792 75 121 22
Sum due Piatt, 2d May, 1833,
$22,913 97
In this state of case, we do not feel warranted in saying that the-complainant’s judgment is satisfied and inoperative. It seems satisfactorily made out that the complainant does sustain the relation of a judgment creditor to the estate of St. Clair, and that his execution cannot be satisfied at law. The personal assets are exhausted. Thireal estate has been passed into the hands of a trustee, subdivded and sold out, and is now colorably held discharged of the lien of the creditors of the intestate. The case seems to us one in which chancery will afford redress unless the complainant has done some act to deprive himself of its aid.
*275 *It is objected to the complainant’s right, that since this [270 suit was commenced he has entered into the agreement of May, 1831. Having a fraudulent object as it regards the Bank of the United States, one of the defendants; and that he is so affected by this fraud, that chancery will refuse him aid and leave him to his leo-al remedy. As to this, it is sufficient to say that the testimony shows that this paper was executed by the complainant and the heirs under the expectation that the bank would accede to it. But the bank having refused its sanction to the proposed measure, it has not since been esteemed valid amongst the parties to it. This objection therefore fails. The following is the agreement referred to:
“Memorandum of an agreement made between Arthur St. Clair, John St. Clair, Eliza St. Clair, of full age; Francis M. St. Clair, Margaret Belfour St. Clair, Laura St. Clair, heirs of St. Clair, dee’d, by their guardians, on the one part — and George Wallace and Daniel Gano, as securities for D. Shepherd, Benjamin M. Piatt, survivor of John H. Piatt, dec’d, and Richard Fosdick, on the second part:
“Whereas, the Bank of the United States holds a large and valuable real estate, which was of the late Arthur St. Clair, dec’d, which the said bank received in payment of certain debts against said estate, amounting, as is supposed, to the sum stated in the schedule below; and whereas, it is considered that the proceedings by virtue of which they (the bank) became the holders of said real estate are void, or voidable, and irregular, especially that the said arrangement was so made as to secure to said bank the whole amount of her debt, to the exclusion of the other creditors aforesaid; and whereas, it is supposed that the real estate aforesaid is sufficient in'fact to pay all the debts held by the said bank, as aforesaid, against said estate, and all the other debts above enumerated, and as specified in the schedule below: — Therefore, for the purpose of a just and fair settlement of said debts of said estate, it is agreed by the said heirs, and the said creditors, as follows, to wit: The real estate, held by said bank aforesaid, shall be decreed to be sold by the court, either in the suit now pending, or such other suit as shall be brought — and Samuel Lewis on 'the part of creditors, and E. S. Haines, on the part of the heirs, shall, by consent of the court, be appointed special masters for the purpose of subdividing and selling to the best advantage said real estate, the proceeds of which shall be applied to the payment of the debts against the estate, as follows: first, the debt due to the bank, and the other debts aforesaid, to be paid, if from said proceeds there be funds sufficient to pay the same; and the res *276 idue of the funds, after paying said debts and expenses, to be divi271] *ded and paid over to the said heirs, according to law. It is agreed that no defence whatever shall be set up to the debts aforesaid, and no hindrance, either on the part of the administrator or the heirs of St. Clair, to the most speedy settlement of the said debts of said estate, according to this agreement: and it is further agreed that no other property of said estate shall be resorted to for the payment of said debts. But if the said property so held by said bank shall prove insufficient, then the loss to be sustained by the creditors aforesaid, in proportion to their several claims aforesaid. The defences put in, in the suit now pending, are to be withdrawn.
“ It is also understood that Charles Vattier has a claim against said estate which is contested, and is supposed to be without foundation; which claim, if recovered against said estate, is to be admitted to a pro rata dividend with the creditors above enumerated: provided, however, that no greater sum shall be admitted to a distribution than what will, with the debts above enumerated, amount in all to ten thousand dollars, besides the Piatt debt.
“In witness whereof, the parties have hereunto set their hands this fourteenth day of May, A. D. 1831.
“John St. Clair,for myself and Arthur St. Clair, and Eliza St. Clair, and as guardian for Margaret B. St. Clair and Laura St. Clair.
“ Charles Fox, guardian for Erancis M. St. Clair.
“ Benjamin M. Piatt, survivor, &of

Schedule of the debts tabeen into view in this agreement.

$2,253 45 1,100 OO 202 81 20,113 41 Claim of George Wallace, 8th April, 1824, D. Shepherd, . . . . Fosdick, January 20, 1820, . Benjamin M. Piatt, May 30, 1828,
Claims of Bank United States:
September 25, 1820, May 11, 1821, . June 29, 1820, . March 6, 1820, . December 8, 1823, Taxes, $12,422 00 8,107 90 14,587 00 4,000 00 2,250 00 350 00 --$41,716 90
The 27th section of the judgment and execution law, of the 4th February, 1824 (22 O. L. 118), allows judgment creditors, after the *277 time provided for executors and administrators to settle their ac-. counts has expired, to proceed by scire facias, to charge the judgement upon the lands of decedents, held at their death. The [272 administration laws give to the executor and administrator authority, on application to the probate court, and upon its order, to sell these lands to pay debts. The act concerning executors and administrators, passed the 12th of March, 1831 (29 O. L. 240), repeals the clause of the act of 1S24, allowing the scire facias against heirs, and limits the lien of the creditor upon the lands of the decedent, to five years from the decease, if the estate is settled up with the probate court; or, if not settled, to the time of five years after the estate shall be settled. After such limitation, lands are held by the heir, or his alienee, discharged of the lien, though the heir is liable upon any claim against the estate, to the full extent of the assets received from the estate. At no period, we believe, have the lands of a decedent in this state been free from the encumbrance of his debts, in default of personal assets; and we believe the representatives of the personalty have always had power, in some proceeding in the j>robate court to convert lands necessary to pay debts, by sale, into personalty for distribution among creditors. We are of opinion, that the proceedings by scire facias by the creditor, did not, at any time, exclude the jurisdiction of this court. The policy of our law of descents and distribution, has always looked to the equal distribution of intestate’s effects, first among creditors, and secondly, of the residue, among heirs. The strictly legal proceeding by scire facias by the creditor, provided in the act of 1824, in its practical operation, would have defeated an equal distribution, by enabling a diligent creditor, who should first proceed, to make an appropriation of the whole of the lands to himself, excluding other creditors. The law prohibited the recovery of costs, if suit was brought against the administrator before the expiration of the time limited for settling the estate: so that creditors, if they brought suit, could recover no costs, and if they did not bring suit, they would be in danger of losing their claims by the superior diligence of some more considerate creditor. Another difficulty, still, would be felt. A great proportion of claims in this state are within the jurisdiction of justices of the peace. On judgments by justices, no scire facias could issue, nor would such judgment authorize the sale of land. The practical operation of such a system would be, first, a partial appropriation of decedents’ effects among creditors; and second, to give a decided preference to the holders of large claims within the jurisdiction of courts of record, over the holders of smaller claims within a justice’s *278 jurisdiction. We cannot think this was the intention of the general assembly,' or that in passing these laws it was intended, to take from 273] *this court the power of proceeding, in controversies where one suit would settle the whole estate, and execute the laws in their spirit of equality and justice.
■ This brings us to consider whether the sale to Arthur St. Clair for taxes, and by the administrator, were' such 'as to discharge the lauds which descended to him and others, from the payment of the debts of their ancestor? At the death of St. Clair, his real estate descended at once to his children as heirs-at-law, encumbered, it is true, with a liability for his debts: but until actually subjected to the debts by the personal representative, or by the creditor in some judicial proceeding, they were the property of the heirs. The possession was theirs, the rents and profits theirs; and they were bound of course to pay the taxes. It would be strange, indeed, if either a court of law or equity should feel compelled to give such effect to the culpable omission of the heir to keep down the taxes, as to enable him by the omission to acquire a perfect title to the estate, to the total exclusion of those whose rights he was bound to protect. We look upon the purchase by the heir for taxes as but his own method of paying them. He was bound to pay, and the conveyance to the heir, or under his direction, to his guardian, in no way changed the situation of the estate. The guardian could not purchase up the estate of his ward and acquire any right, except for his ward. Whatever, therefore, passed by the sale for taxes, accrued to the benefit of the heirs who before held the fee. The conveyance by the guardian to Benham, as trustee, effected no change in the estate, at least so far as it regarded creditors. None of the parties at the time regarded these transactions as disencumbering the estate from the debts of the intestate. This is conclusively evidenced by the subsequent sale to the same person by the administrator. If, as is contended, the first sale passed the estate from the heirs of St. Clair, what was there left for the administrator to sell ?
If the sale by the administrator was made in pursuance of an understanding on his part to place the intestate estate out of the reach of creditors for the benefit of the heirs, it was in legal contemplation fraudulent and void, however laudable the motives which influenced the act on the part of the administrator. As administrator, he was the legal trustee of the fund, guarding alike the interest of the creditor and heir. He had no legal right to engage in any act tending to the advantage of one of those for whom he held in *279 trust, and to the exclusion of another. The return to the probate -court, and confirmation there, imparts to this void act no vitalit¡r. ■*The parties to a fraudulent act cannot make it available [274 •against a stranger to the fraud. The genius of the law opposes itself to all fraud, and the most solemn judicial proceedings when tinctured with it are vitiated; 5 O. 294. The sale to the heir under the circumstances, being of no avail against a creditor, it follows of course, that the conveyance to Benham in trust, in ¡performance -of that sale, can be of no greater avail. The law conferred upon the administrator no power to create a trust. Conveying in trust as •agent of the minor heir, he could convey no more right or estate than that heir had. If it be conceded that a minor can create a trust estate by directing a third person to convey to a trustee, that will make no difference in this case, because, if the heir were capable •of making the contract, he is chargeable with the legal fraud, and •can avail himself of no advantage resulting from it. If incapable of making the contract and creating a trust, how can Benham, the trustee, acquire any title ? We consider this conveyance, and those made under it, as if made by the heirs themselves. The guardian, ■administrator, and trustee, in these conveyances, are the agents of the heirs. The heirs, as such, had an undoubted right to sell the real estate which had descended to them. The purchaser took, subject to the encumbrance of the debts of the ancestor. The extent of the lien of this encumbrance, and the manner of enforcing it, is matter of general law. No one dealing with heirs, for lands cast upon them by descent, can acquire the estate discharged of the encumbrance of the debts, because they were .ignorant of the law. Ignorance of the law excuses no one; much less will it impart to its possessor the power of acquiring property in land directly contrary to law. This principle applies to the original conveyances in this case, and to all the mesne conveyances. No one could trace his title, without carrying it back to the decedent, and from him, by descent, to the heir.
It is strenuously argued that the Bank of the United States and the other defendants and alienees .are bona fide purchasers without notice, and entitled to be protected against the creditor. Is this true as a fact ? Did the bank suppose the legal title in the guardian or trustee ? It is .declared as a fact in the evidence printed by the bank, and urged in argument, that the bank agent considered the sale for taxes void, and threatened suit, and that the guardian, to avoid the vexation • of the suit, conveyed to Benham. The bank became the grantee of Benham, himself a trustee, for a large portion *280 of this estate. With whom were the negotiations for the purchase carried on ? St. Clair, the minor heir and pretended owner, or his 275] ^guardian? Benham, the trustee? With neither. The negotiation was opened with the administrator, or his agent, the respondent Avery, before the transfer to Benham, or the sale by the administrator to St. Clair. After these alleged sales and the conveyances, it Avas completed ; but the case is without a scintilla of evidence going to show any change in the negotiations on account of the sales. Is it possible to believe that the agent of the bank completed so large a purchase, after those sales, under the belief in their efficacy to pass the estate from the administrator and creditor,, and still continued his negotiations with the administrator, whose-interest in the subject had passed entirely away? The agent swears that he had confidence in the soundness of the title, and purchased. He does not claim to have been ignorant of any fact connected Avith the title. Knowing the facts, he rested on his confidence in the soundness of the title. The face of the deed to Ben-ham, every paper connected Avith the title, discloses to the world the nature of his interest and the connection of the St. Clair heirs, with it. Questions of this kind are determined by known, settled principles ; principles well understood and inflexible ; principles-that cannot contract or expand, and will not vary on account of the variety or the magnitude of the interests involved. It is urged upon-us with much A ehomence, that the estate in question is immensely valuable; that large sums have been expended in improving it; and that many persons are now interested. We do not see why these arguments were pressed. Surely no counsel can suppose this court wants firmness to do its duty because great interests are involved and numerous individuals are to be affected ; or imagine Ave-had power, in the administration of the law, to consult expediency or policy. With such questions, Ave have nothing to do. As a. court, we “can listen only to the mandates of the kw; and can tread only that path Avhich is marked out by duty.”
Considering, then, as we do, the conveyances to Benham, and all the mesne conveyances from him, as but the conveyances of the heirs and their alienees, there can be no question but that all who derive title from that source are legally affected with notice, and take their respective portions of the estate subject to the encumbrance of the intestate’s debts. The question iioav presented, is-.. IIow will equity enforce the lien of a creditor upon the estate in the hands of heirs or their alienees ?- At Kaa-, the heir is only liable to-the creditor for what he has received of his ancestors by descent;. *281 .and a jury, upon a scire facias, may assess the value of the lands descended. The creditor is limited in his recovery to that amount; * Brown, v. Shuker, 2 Crompton and Jarvis, 311; Mc Vicker's [276 v. Ludlow's Heirs, 2 O. 246; Union Bank of Georgia v. Meig's Heirs, 5 O. 314; 1 Strange, 665; Wolf v. Pounsford, 4 O. 397; 1 Penn. 152.
In cases where several distinct tracts of land have descended to the heir, some of which have been aliened by him, and some not, ■equity will so far control the creditor in asserting his lien as to require him to resort first to the land remaining in the heir unaliened, and will discharge the residue from the lien upon payment of the balance due. It will ascertain the value of the property descended, 'and the amount of the claim upon it. Where justice requires it, we doubt not the power of the court to permit a liquidation of the ■demand in discharge of the lien; or to impose such conditions upon the sale of the estate as shall do justice to all having an interest in the subject. It seems to us equally clear, that the demands of justice cannot require, and that a court of equity will not lend its aid, to enforce a lien upon a particular tract of land, which has passed into the hands of third persons, until the residue of the estate subject to the lien, which can be conveniently realized, is exhausted. It is a rule of equity perfectly well established, that where one has a lien upon tAvo funds, and another a posterior lien upon only one of them, the one having both liens will be compelled to assert his claim first upon the subject of his exclusive lien, so that he may be ■satisfied, if possible, without interfering with the rights of the junior creditor; 1 Hopk. 66, 460; 4 J. Ch. 123; 19 John. 486; 2 Atk. 446; 1 H. Blk. 150; and M. H. Co. v. Bank U. S. and Ruffners, decided at Hamilton (ante 206). The rule, in our view, is directly applicable to this case. That portion of the real estate of St. Clair which remains unsold is subject to the lien of the creditors of the estate, and to no other lien. That portion aliened by the heirs, either directly or through the intervention of their agent and trustee, Benham, is subject to the same lien, and also to that of the alienee. The application of the obviously just rule referred to, requires of the court, first to subject the lands Avhich remain in the hands of the heirs, to the creditors of the estate.
It was urged in argument, that the claim of the alienees rested on the same foundation with that of the heirs, and if the sale by the administrator was considered invalid, that all the proceedings under it should be disregarded, and the creditor left to assert his lien upon ■the entire estate descended, or upon such portions of it as he should *282 select. Perhaps this position might be admitted, if urged in' a court, of law upon a scire facias, but it will not obtain in this court, having the whole subject and all the parties before it, and the power so to-277] *shape its proceedings as to■ attain the ends of justice, and .settle the whole matter amongst all interested, without further litigation. A party asking justice at the hand of this court, is always required to do justice; and the court never lends its aid to do an unjust or inequitable act, or one calculated to involve others in vexatious litigation or controversy, further than is absolutely necessary.
As there is an administrator of St. Clair’s estate party defendant,, there will be little difficulty in ascertaining the outstanding claims upon the estate, chargeable upon the realty, and so shaping our proceedings as to effect a complete adjustment, not only of the claim of the complainant, but of all others remaining unpaid. The continuing minority of some of the heirs is no obstacle in the way. A creditor’s lien for debts of the ancestor may be enforced against minor as well as adult heirs coming into an estate by descent. The conveyances to and by Benham ; the subdivision of the estate-by him ; the partition amongst the heirs, are all acts of confirmation of those transfers, and more or less obligatory upon the-heirs ; perfectly obligatory upon the adult heirs who have done-any act of confirmation since they have attained to majority, or-shown a disposition to acquiesce. But we are not called upon now, in the view we take of the case, to decide the questions amongst the heirs. Questions touching their interests may arise in some-future stage of the cause : and if they do, they will then be considered.
Upon the whole, we consider—
1. That the complainant has an outstanding judgment against the estate of Arthur St. Clair, for which he can have relief in this court, and that there are other outstanding claims against the estate.
2. That the personal assets of the estate have been exhausted..
3. That the purchase of the realty for taxes, accrued to the benefit of the heirs and the estate.
4. That the pretended sale of the realty by the administrator is fraudulent and void as against creditors ; and that the estate descended upon the children and heirs-at-law, subject to the payment of the debts, and is still liable for the same.
5. That the estate be charged with the sum necessary to pay the outstanding debts, the costs of the complainant, and the master’s, further proceeding.
The.following decree was entered in the cause:
*283 This cause came on to be heard upon the bill, amended bill, answers, replication, exhibits, and evidence, and the court having seen and read the papers and evidence, and heard the argument of counsel thereon, finds that the complainant recovered a judgment *against the administrator of St. Clair, on the tenth day of [278 May, one thousand eight hundred and twenty-one, upon which execution has been issued, returned; that there areno goods or chattels of the defendant out of which to make the amount; and that, after allowing to the estate of St. Clair credit for the amount of the mortgage money, and all other demands of the estate against the complainant, there is left due the complainant in equity, on the second day of May, one thousand eight hundred and thirty-three, including costs and interest, a balance of twenty-two thousand, nine hundred and thirteen dollars, and ninety-seven cents; that the personal property of the intestate, St. Clair, has been completely exhausted in the payment of debts and expenses by the administrator, leaving the amount due the complainant and other claims unsatisfied; that the real estate described in the bill descended to the heirs-at-law, subject to the payment of the debts due by their ancestor; that the purchase by A. St. Clair, one of the heirs-at-law, for arrears of taxes, and the conveyance under said purchase to John T. Jones, guardian for said heir, enured to the benefit of all the heirs of the intestate St. Clair, and left the estate so purchased subject to the debts due by their ancestor. That the subsequent sale of the real estate of the intestate by the administrator to young St. Clair, then a minor, the conveyance by St. Clair and the administrator to Joseph S. Benham, as trustee, the partition of the premises by the trustee and heirs, and the sale and conveyance thereof since, do not vest in said trustee or his alienees, or the heirs of the estate, the land so conveyed discharged of the debts of said intestate; but the said sale, conveyance, and proceedings are fraudulent and void as against the rights of creditors to enforce the payment of their debts out of said estate. And the court is of opinion that the law and equity arising upon the facts is with the complainant. But inasmuch as the court is not fully advised of all the facts and details necessary to a final disposition of the whole matters arising, it is ordered and decreed, that the carrse be referred to Crafts J. Wright, a master commissioner of this court, with instructions to ascertain and state accounts, showing—
1. IIow much is due from the intestate to other creditors than the complainant, including interest up to the second of May, eighteen hundred and thirty-three, showing the name of the creditor, and the amount of each claim and interest.
*284 • 2. What land of the intestate descended to his heirs-at-law, designating what lies in the city of Cincinnati, by the description by which it is known in the subdivisions made by Benham and the heirs.
279] *3. What parcels of said lands are still held in common by the heirs-at-law,
4. What portions of the land descended have been since aliened by the heirs, or the trustee, or otherwise; specifying the date of the conveyance, the names of the grantors and grantees, the tract conveyed, and the person holding the same on the tenth of July, one thousand eight hundred and twenty-eight, at the filing of the bill in this case.
In the taking of which accounts the said master may examine the documents and evidence on file, and the parties may take other testimony, and may, if necessary, compel the parties or witnesses to produce before him any books or vouchers, or written evidence in their possession or control; and if the sum due the complainant, and those found due to other creditors of the intestate, with the accruing interest, the costs of this suit, and of the master in executing this order, be not paid, within sixty days thereafter, into the hands of the master, for those interested, the said master shall forthwith, after the expiration of said sixty days, proceed to raise the money required to discharge the said claims and costs, by sale of so much of the real estate descended as aforesaid, according to the laws of Ohio regulating sales on execution, as may be necessary to raise said moneys, in the following order: that is to say—
1. Those lands, if any, which the said heirs still hold in common.
2. Those now held by the heirs in severalty, apportioning to each heir the proportion of the sum required, and selling so much of each one’s share as may be necessary to raise from each so much of his proportion of said sum as shall not be otherwise paid to said master.
3. Those which have been aliened or conveyed by the trustee or heirs since the tenth of July, one thousand eight hundred and twenty-sight, or so much of them, beginning with the latest conveyed, as may be necessary to produce the required sum.
4. And if after the foregoing sales, the sum raised is insufficient to discharge said claims, that then the master report the deficiency to the court, with his proceedings, and the evidence by him taken.
And it is further ordered, that if the parties are dissatisfied with any of the accounts stated and allowed by the master, or his proceedings from time to time in the progress of his acts, and file ex *285 ceptions, the master shall forbear proceeding- to make sale of the premises until the exceptions are disposed of.
And for the coming in of the report and further proceedings, the cause is continued.
[Referred to Piatt v. St. Clair, 7 O. 2d pt. 165, 166. Ultimate beneficiary of trust may be plaintiff; Darst v. P., F. W. & C. R R., 4 W. L. G. 379.]