## The Commonwealth *ex rel.* Reinboth *versus* The Councils of Pittsburgh.

*Municipal Subscription to Railroad Companies, how affected by subsequent Alteration of Charter.—Power of Municipal Corporation to subscribe for Stock.*

By Act of Assembly of April 4th 1837, the Pittsburgh, Kittaning and Warren Railroad Co. was incorporated, and under it, any incorporated company, city, or borough had authority to subscribe for the stock "as fully as any individual:" the charter was to be null and void if the road was not commenced within five and completed within ten years from the passage of the act. Before the expiration of that time, the supplement of 16th March 1847 was passed, extending time for commencing until 1st June 1852, and for completion until 1st June 1862. By supplement April 15th 1851, the time for commencing was extended to June 1st 1855, and for completion until June 1st 1865. By another supplement, 14th April 1852, the name of the road was changed to The Allegheny Valley Railroad Co., certain counties were authorized to subscribe, the counties and cities subscribing to pay by transfer of stocks held in other companies, and removing the disability of the acts limiting the corporate debt of the cities of Pittsburgh and Allegheny, so that neither city should be prevented from subscribing. The city of Pittsburgh, by ordinance of May 7th 1852, subscribed for 8000 shares, and issued bonds for payment of subscriptions. On application by a bondholder for mandamus to compel the payment of interest, &c., an answer was filed denying the right of the city to subscribe, or to issue bonds in payment of subscription. *Held:*

1. That the right to subscribe under the Act of 1837 did not expire in consequence of the failure to commence and complete the road within the time mentioned in the act, for it was in the power of the legislature to waive the right of the state to resume the privilege offered, which was done by the supplements of 1847 and 1851, extending the time within which a company might be formed to accept the franchises offered in the original charter, which was never withdrawn, and after acceptance by the company had not been lost by non-user.

2. That the change by the legislature of the name of the railroad company did not affect its identity, for no other company was ever organized under the original act; nor, when the Act of 1852 relieved the company from the duty of fixing the termini of their road at certain points named in the original act, could a subscription made *afterwards* be invalidated because the termini had been changed.

3. The power to subscribe gave the power to create a debt and to give an evidence of it. The city was to subscribe "as fully as an individual," and as an individual, by agreement with the company, could have given his bond for his subscription, so could the city.

4. A municipal corporation may give its bond for a legal and authorized

[Commonwealth *ex rel.* Reinboth v. Councils of Pittsburgh.]

debt, under its general corporate powers; the power to execute and issue bonds, &c., belongs to all corporations, and is inseparable from their existence; it is for this they hold a common seal.

5. Though grants to corporations are to be strictly construed in favour of the public, this is a rule to be invoked in seeking what has been given—it is a reason for holding that an authority has not been conferred upon a corporation, if the words of the grant are not clear and unambiguous; but not for stripping a power given of its natural and usual incidents.

6. A municipal bond for the stock of a railroad company, if invalid, is so, not because the municipal corporation has no power to issue bonds, but because such a subscription is outside of the power of the corporation: but when the legislature has authorized the subscription, it becomes a debt like any other, and may be secured and evidenced in the same way; consequently the city had power to make the subscription to the stock of the railroad company, and the bonds were lawfully issued.

7. Thomas v. The Commissioners, 8 Casey 218, Hamilton v. The Councils, 10 Id. 496, Armstrong v. Commissioners, 1 Wright 277, and Middleton v. Same, 1 Id. 237, affirmed, as expressing the present opinions of the court on all points therein raised and decided.

MANDAMUS to the Common Council of the City of Pittsburgh.

This was an alternative *mandamus* issued out of the Supreme Court, on the relation of J. D. Reinboth.

The writ recited, *inter alia*, the incorporation and organization of the Pittsburgh, Kittaning and Warren Railroad Company, which name was subsequently changed by Act of Assembly to that of "The Allegheny Valley Railroad Company."

That, in pursuance of certain Acts of Assembly, and of an ordinance of the said councils, the City of Pittsburgh subscribed eight thousand shares to the capital stock of the said company, and that certificates of loan or bonds of the city having coupons attached in the gross amount of $400,000, and in amounts of $1000 respectively, dated the 2d day of May 1853, duly signed by the mayor, countersigned by the treasurer, and sealed with the corporate seal of the city, were issued in payment of such subscription.

That J. D. Reinboth, as trustee of Emily M. Henson, purchased and is possessed of seven of said certificates of loan representing $7000, which on their face respectively set forth that the faith, credit, and property of the city of Pittsburgh were pledged for the payment of the principal and interest thereof.

That a large amount of interest on said certificates is and has been for some time past due and payable, but that the city had neglected and refused to pay the interest due, or make provision for the payment thereof, by the assessment and collection, or otherwise, &c., &c., and praying for a *mandamus*, commanding the councils forthwith to make ample provision for the payment of the same, &c., &c.

To which the respondents filed a plea and return similar to those filed in the cases reported in 8 Casey 218, 10 Id. 496, and

1 Wright 237, 277, with some additional matter of defence not adjudicated in the cases above referred to, all which are fully stated in the opinion of this court.

The case was argued by *George Harding*, *Eli K. Price*, and *Wm. M. Meredith*, for the relator, and by *Barton*, *Williams*, and *Howard*, for respondents.

The opinion of the court was delivered, January 6th 1862, by STRONG, J.—Nearly everything contained in the plea and return to the alternative writ, has been considered and adjudged insufficient in similar cases heretofore decided : Commonwealth *ex rel.* Thomas *v.* The Commissioners of Allegheny County, 8 Casey 218; The Commonwealth *ex rel.* Hamilton *v.* The Select and Common Councils of Pittsburgh, 10 Id. 496; The Commonwealth *ex rel.* Armstrong *v.* The Commissioners of Allegheny County, 1 Wright 277, and Commonwealth *ex rel.* Middleton *v.* Same, 1 Id. 237.· We shall not travel over the ground more than once trodden. Referring to those cases as expressing our present opinions upon all the questions then considered and again raised by this return, we shall notice only those which have not been heretofore adjudicated.

The return denies that any authority was ever given to the city of Pittsburgh to subscribe to the capital stock of the Allegheny Valley Railroad Company, or to issue bonds in payment of a subscription, or to secure its payment. The passage of Acts of Assembly, which the relator claims to have conferred a power to subscribe, is admitted, but it is insisted that they did not confer any such power. This portion of the return therefore presents a mere question of law, to be determined by an examination of the statutes.

By an Act of Assembly passed on the 4th day of April 1837, the governor was empowered to incorporate a company by the name, style, and title of " The Pittsburgh, Kittaning, and Warren Railroad Company," with power to construct a railroad from the Allegheny river, at the borough of Franklin, to the Ohio river at or near the borough of Beaver. By the second section of the act it was enacted, that any incorporated company, city, or borough, should have authority to subscribe to the stock " as fully as any individual." The seventeenth section enacted, that if the company should not proceed to carry on the work within five years from the passage of the act, and complete the same within ten years, the charter should become null and void, except so far as it compelled the company to make reparation for damages. On the 16th of March 1847, before the ten years had expired, a supplement was passed, extending the time for commencing the road until the 1st day of June 1852, and the

time for its completion until the 1st day of June 1862, and authorizing the company to extend their road from Warren to the New York state line. By another supplement passed April 15th 1851, the time for commencing was extended to June 1st 1855, and for the completion until June 1st 1865, and the company was authorized to build a railroad from Pittsburgh to Kittaning, and thence to the New York state line. The twenty-first section of the original enactment was also repealed, the section which named Beaver, or its neighbourhood, as a terminus. Yet another supplement was passed on the 14th of April 1852, changing the name of the corporation to " The Allegheny Valley Railroad Company," and authorizing certain counties to subscribe to the stock, without directing the mode of payment, but providing that, whenever bonds should be given in payment, they should not be sold for less than par, and should not be subject to taxation till the clear profits of the road shall amount to six per cent. upon its cost. The fourth section declared, that it should be lawful for the several counties *and cities* subscribing, to pay, if agreed upon by the parties, by the transfer of stocks held by them in other companies. And the sixth section enacted, that the several Acts of Assembly, limiting the corporate debts of the cities of Pittsburgh and Allegheny, should not prevent either of the said cities from subscribing to the stock of the Allegheny Valley Railroad Company. Such has been the legislation.

In pursuance of these Acts of Assembly, and of an ordinance of the Select and Common Councils, passed May 7th 1852, the city of Pittsburgh subscribed for eight thousand shares of the capital stock of the company, and issued its bonds in payment of the subscription.

The respondents now contend that this subscription was unauthorized, because, as they say, the right to subscribe, given by the Act of 1837, had expired in consequence of the failure to commence and complete the railroad within the time limited by the act. When it was passed, there was no company in existence. The act was but the offer of certain privileges to any who might accept them on the proposed conditions. Had it contained no provision that it should be null and void, if the work should not be commenced and completed within the defined period, the right to subscribe, given by it, would have been of indefinite duration, certainly it would have lasted as long as the charter. With no propriety can it be said, that while the franchise tendered to the company remained, the right to make and receive the city subscription did not continue. But the tender of the franchise was never withdrawn, and after it had been accepted, it was never abandoned or lost by non-user. It was quite in the power of the legislature to waive any right reserved to the state to resume

[Commonwealth *ex rel.* Reinboth *v.* Councils of Pittsburgh.]

the privileges offered, or to withdraw the tender, and they did waive it before the privileges had been lost. By the supplements of 1847 and 1851, they extended the time within which a company might be formed and accept the franchises offered. These supplements, as well as that of 1852, are a part of the original charter, to be construed with it, and they show that the rights given and the powers conferred, will continue until 1865. If the legislature has declined to take back the privileges tendered; if they have declared that all the rights, privileges, and immunities shall remain, it is vain for one who has contracted with the company to insist, that any of them have been lost by forfeiture or non-user. That the power to subscribe, at first, expressly given to the city of Pittsburgh, was supposed and intended by the legislature to exist in 1852, is manifest from those parts of the supplement of April 14th 1852, to which reference has already been made. If not, why the enactment that certain Acts of Assembly should not prevent such subscription ? And why authorize the payment of such subscription by a transfer of stocks, if the parties should so agree ? It is then an untenable position that the right to subscribe, given by the Act of 1837, had ceased to exist on the 7th of May 1852, when the subscription was directed by the city councils.

Again, it is insisted, that though authority was given to subscribe to the stock of the Pittsburgh, Kittaning and Warren Railroad Company, none was given to subscribe to the stock of the Allegheny Valley Railroad Company. It is said the latter is not the same company, either in name or object, which was chartered or authorized by the Act of April 4th 1837. But this is a mistake. The name was changed by the legislature, but the identity was not lost.. No other company than the Allegheny Valley was ever organized under the Act of 1837, and no other can be. Its life, its powers, and its privileges it derives from that act, and, as the name was changed by a supplement, the first act is to be read with the name Allegheny Valley Railroad Company, in the place of the Pittsburgh, Kittaning and Warren Railroad Company. Nor is there anything in the fact that the supplement of 1852 relieved the company from the duty of fixing the termini of their road at or near Beaver and Warren. This did not destroy its identity. It is still the corporation created by the Act of 1837. Plank-Road Company *v.* Arndt, 7 Casey 317, and its kindred cases have no applicability to such a state of facts. In those cases it was ruled, that if the legislature change the termini of a road authorized to be constructed by a company, subscriptions to stock *previously* made are released. It was not held that the company did not remain the same. A contract of subscription previously made with it, could not be enforced because the motive and the consideration for the sub-

[Commonwealth *ex rel.* Reinboth *v.* Councils of Pittsburgh.]

scription were withdrawn, or changed by the alteration of the terminus of the road. Even that does not exist in this case. The subscription was not made until after the supplement of April 14th 1852 was passed, and until after Beaver and Warren had ceased to be necessarily at the beginning and end of the road.

It is finally contended, that even if there was authority to make the subscription, there was none to issue bonds in payment. The language of the Act of 1837 is, " any incorporated company, city, or borough shall have authority to subscribe thereto as fully as any individual." Now, power to subscribe, was power to create indebtedness. The creation of a debt was clearly contemplated. If not, why did the supplement of 1852 remove the disability to create a debt by subscription, which was thought to have been interposed by former acts? And if authority was given to the city to incur a debt by subscription, necessarily it included authority to give the creditor the usual evidences of a debt. Who would doubt that a power to borrow money carried with it a right to give a bond or a note to the lender? It is a necessary incident, without which the power is worthless, and in every grant, whether it be of property, of. a franchise, or of a power, there is included everything necessary for its enjoyment. This is as true of grants to corporations, as of those to natural persons. Grants to corporations are indeed strictly construed in favour of the public. This is a rule to be invoked when we are seeking for what has been given. It may be a reason for holding that an authority has not been conferred upon a corporation, if the words of the gift are not clear and unambiguous, but none at all for stripping a power given of its natural and usual incidents. A power actually conferred is not the less, because held by a corporation. And this admitted principle is held for the benefit of the public, not of the corporate body. It would be a perversion of its design to allow it to be used by a corporation to defraud its creditors, or to protect itself against its own assumed obligations.

The obvious purpose which the legislature had in view in granting to the city of Pittsburgh the right to take stock was to further the enterprise of building the railroad by providing a possible increase of means. This purpose would not have been accomplished by a barren grant of a right to subscribe without the power to give such securities for the debt created, as could be made available. The city was authorized to subscribe " as fully as any individual," a natural person. Now after the organization of the company, a natural person might have made a subscription, payable with his own bond or note, if the company had agreed thereto. When, therefore, the legislature conferred upon the city a power as large as that which a natural person

[Commonwealth *ex rel.* Reinboth *v.* Councils of Pittsburgh.]

possesses, it is evident that they gave in it power to give any securities for the debt which such a person might have given.

There is another course of argument which may be very briefly stated, and which leads to the same conclusion. The power to execute and issue bonds, contracts, or other certificates of indebtedness belongs to all corporations, public as well as private, and is inseparable from their existence. It is for this that they hold a common seal. No one would doubt that for a legal and authorized debt, a municipal corporation might give its bond, under its general corporate powers. If a bond given by such an obligor be void, it is not because of the form of the instrument, nor because general corporate powers do not warrant giving bonds, but because the debt for which the bond has been given was created without authority, against law, or without law. A municipal bond for a subscription to the stock of a railroad company is ordinarily invalid, because such a subscription is outside of the powers of a municipal corporation. But when, as in this case, the legislature has authorized the subscription, and when, therefore, it has been made in the legitimate exercise of powers conferred, it becomes a debt like any other, and may be secured and evidenced in the same way. Then it is unnecessary for the legislature to declare that bonds may be given for it, for the power to give bonds was conferred by the charter itself.

We are of opinion, therefore, that the city of Pittsburgh had the power to make the subscription which was made to the capital stock of the Allegheny Valley Railroad Company, and that the bonds issued by the city were lawfully issued.

There being nothing else in the return which has not already been considered and overruled in former cases, a peremptory *mandamus* will be awarded.

Opinion by
LOWRIE, C. J.—It is so firmly settled in our law that a municipal corporation has no inherent authority, as such corporation, to become a stockholder in any other corporation, that we start with this rule, without stopping to prove or to vindicate it. And as municipal corporations are, in all their functions, creatures of the legislature, they can urge no exception to this general rule, without bringing in their hand the Act of Assembly that proves it. On the merits of this controversy, therefore, the first thing to be done by the bondholders is to show a legislative exception to the general rule of corporate authority, and that it applies to their case. Both the authority and the terms of the rule are clear, and so must it be with any valid exception to it. That cannot be a valid exception which is either undefined or of doubtful authorization: 1 T. R. 124; Wilcocks on Mun. Corp., § 12;

[Commonwealth *ex rel.* Reinboth *v.* Councils of Pittsburgh.]

Story on Agency, § 83.  Let us examine the evidence offered to prove the exception insisted on here.

The act of incorporation, 4th April 1837, § 2, P. L. 435, allows cities to subscribe for stock in the company then intended to be created, and we may assume, for the present, that this is sufficient evidence of an exception such as is contended for. Then comes § 15, which declares that if the company shall not proceed with the work within five years from the passage of the act, "then this charter shall become null and void:" and then we have the fact that, for more than ten years, nothing was done, no stock was taken under the commissioners appointed to initiate the corporation.  Of course the Act of Assembly thereby became null and void: this is too plain for discussion.  Its principal purpose, the creation of a railroad company within a limited time, having failed, of course the authority, incidentally vested in cities to subscribe, failed also.  Argument can neither evade nor strengthen this conclusion.

Was the authority ever revived or renewed?

By the Act of 1847, P. L. 443, the time for beginning the work on the road was enlarged to 1st June 1852, and by the Act of 1851, P. L. of 1852, p. 720, it was further enlarged to 1st June 1855.  Interpret this in its largest sense, and it can amount only to a grant of further time to the projectors of the road to proceed to organize a company and commence the work.  It is a grant of authority very defectively expressed, and common sense and the common rules of legal implication demand that we shall imply a renewal of the authority to organize a company with the functions defined in the original act: but they allow no more.  They allow the implication of a renewed grant of all the means necessary for beginning the work: but they do not allow the implication of an enlargement of the corporate authorities of the city; for that was only incidentally granted in the former act, and is not a necessary element of the contemplated corporate organization.

The Acts of 1847 and 1851 do not pretend to renew the lapsed authority for cities to become stockholders.  That subject was not at all in the intention of the legislature; no word indicates it.  No question was considered by the legislature but that of enlarging the time for commencing the work: the face of the act shows this, and we cannot, without ourselves legislating, imply that the authority of the city was also enlarged.  To doubt of the renewal of this authority is to decide against it, because the general rule is that it does not exist.  Common sense and all law warn those who deal with delegated functionaries to look to the warrant of authority under which they act, and to be sure of its sufficiency.  If they fail in this, the law can have no help for them.  If they are misled by a false assumption of authority,

[Commonwealth *ex rel.* Reinboth *v.* Councils of Pittsburgh.]

they must either bear their loss or look to those who misled them.

And if we could doubt of the foregoing conclusion from the facts already noticed, there is still another fact that strengthens it materially. The purpose of the projected company, authorized by the Act of 1837, and in which the city was allowed to become a stockholder, was to make a railroad from Pittsburgh, by way of Kittaning and Franklin, to Warren, with a branch from Franklin to Beaver.

This was essentially changed by subsequent acts: first, by the Act of 1847, authorizing the road to be continued up to the state line; and, second, by the Act of 1852, P. L. 335, authorizing an abandonment of the route by Franklin and Warren, and the taking of any desired route from Kittaning to the state line, and this involves an abandonment of the branch road from Franklin to Beaver. In pursuance of this change of purpose, the name was also changed from "The Pittsburgh, Kittaning and Warren Railroad Company" to "The Allegheny Valley Railroad Company."

These acts, therefore, change the name and the purposes of the company intended by the original Act of 1837, which allowed the subscription by the city; and by that very fact the authority to subscribe must change in its character before it can be exercised, and this must be effected by express legislation, and not by judicial implication. An authority to subscribe stock for a road by a given route fails when the route is changed. The authority extended to boroughs as well as cities, and it would seem quite absurd to suppose that the authorities of Franklin and Warren still retained the power to bind their corporations by subscription of stock after the route past those towns had been changed. This presents a result that imperatively repels the implication of the continuance of the authority after the name and the route of the road were changed. The legislature has not authorized the city to subscribe to the Allegheny Valley Railroad Company by the route now allowed to it. Even a subscription of stock actually made might be withdrawn after such a change of route: 7 Casey 317; 17 Barb. 581; Story on Agency, § 462.

But for other evidence of the authority to subscribe, we are referred to the Act of 1852, P. L. 335. It does not expressly confer the authority, but it allows, § 4, cities subscribing for stock to pay in other stocks (which we do not understand), and declares, § 6, that the acts limiting the amount of debts of the cities of Pittsburgh and Allegheny "shall not prevent either of the said cities from subscribing to the stock of the Allegheny Valley Railroad Company."

No one pretends that this contains any express warrant for

[Commonwealth *ex rel.* Reinboth *v.* Councils of Pittsburgh.]

the authority here assumed; and yet, according to well-settled principles, it is an express authority that we are to look for. In such a case legislation can create in no other form, and we must apply a strict interpretation to the terms granting it: Story on Agency, § 68. We can admit no substitute for the express grant except a necessary implication of it, as a means or incident of some other grant of authority. Do we find this here? Not at all. It is assumed to exist at common law, or to have been granted by some former legislation, but we find that this is not so.

The question of granting the authority was not then presented to the legislature or considered by it. It was simply assumed that, in some way, the authority existed, and that the only impediment to its exercise was the limitation on the city debts, and the legislature was asked to remove and did remove this impediment. No more was asked, and they did no more. The substantive question of conferring the authority was never brought before them, and an implication that they then intended to confer it is in contradiction with the facts of the case, and therefore cannot be admitted. It is possible to admit it only as a fiction, and not as a fact; and to admit it thus would be to legislate or confer it ourselves, which we cannot do. Even if we could presume that they would have conferred it if asked, we cannot convert the will into the deed. It seems to me, therefore, that the city councils had no authority to make the subscription which constitutes the essential and admitted basis of these bonds, and of course that the bonds are themselves void.

The foregoing views were written out and printed more than a year ago, and submitted to my brethren in consultation as the expression of my opinion on the fundamental question of this cause. Since then the cause has been very carefully considered, and none of my brethren find themselves able to adopt the conclusions to which I had arrived. I admit that there is great force in the opinion filed by my brother Strong on behalf of the other members of the court; perhaps it will be generally received by the good common sense of intelligent men, as a conclusive answer to the view presented by me, and if so, I ought to accept it thus. I have no desire to express any dissent, for that would be useless. The judgment pronounced by the court is and must be the law of the case; but it seems to me that what I have said above is quite sufficient to show that there is such a legal difficulty in the case as justifies or at least excuses the city councils for not venturing to impose the tax until commanded by their juridical superiors. Besides this, the question may be better understood when both sides of it are briefly and dispassionately presented as they now are.